WISCONSIN COLLECTORS ASSOCIATION, INC., and another, Appellants, v. THORP FINANCE CORPORATION and another, Respondents.

*No. 248. Argued May 5, 1969.—Decided June 27, 1969.*
(Also reported in 168 N. W. 2d 565.)

For the appellants there was a brief by *Geisler & Kay* and *Robert J. Kay,* all of Madison, and oral argument by *Robert J. Kay.*

For the respondent Thorp Finance Corporation there was a brief by *Whyte, Hirschboeck, Minahan, Harding & Harland,* of Milwaukee, attorneys, and *Edward D. Cleveland* of Milwaukee and *Corwin C. Guell* of Thorp of counsel, and oral argument by *Mr. Cleveland.*

For the respondent Nuesse, commissioner of banks, the cause was argued by *E. Weston Wood,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

CONNOR T. HANSEN, J. The narrow issue is whether Thorp, through its plan, is collecting or receiving for payment for others any account, bill or other indebtedness, within the purview of sec. 218.04 (1) (f), Stats.

There appears to be no helpful authority or precedent which is of assistance in resolving the issue presented. A resolution of the question must therefore depend upon an examination of the details of the Thorp plan as was done by the commissioner and the trial court.

Early in 1963, Thorp conceived the delinquent accounts receivable plan here under attack. The parties have previously been before this court on a different issue relating to the plan. *See Wisconsin Collectors Asso. v. Thorp Finance Corp.* (1966), 32 Wis. 2d 36, 145 N. W. 2d 33.

The Thorp plan involves taking assignments of or "purchasing" delinquent open book accounts receivable from merchants, hospitals and professional people. The accounts have been processed in the ordinary course of the assignor-creditor's internal collection procedures, without success. Thorp's accounts receivable program manual describes the procedure which must be followed. There is no significant dispute as to what actually takes place.

The "purchase" is accomplished by the execution of an "agreement for purchase of accounts receivable" which assigns the accounts to Thorp and contains provisions and conditions as to the details of the transaction.

The agreement-assignment form appears to be absolute upon its face.

Under the terms of the agreement at least 50 percent of the net purchase price is paid to the seller within fifteen days of its execution.

The purchase price of an account is in each instance a negotiated "net purchase price." The "net purchase price" as defined in the agreement is the unpaid balance of the account less a discount. The appellant describes

the "net purchase price" as the face value of the account less an agreed discount.

The agreed discount is usually seven to 10 percent, but may range up to 20 percent. The amount of the discount depends on the credit standing of the seller and the nature of the account.

The balance of the net purchase price is called the "Holdback Account." Payment of this account is deferred until Thorp receives full payment from the account debtor. Under the Thorp manual, the discount charged by Thorp is not reported as income by Thorp until after an amount equal to the net purchase price is received by Thorp from the account debtor.

Under paragraph 7 of the purchase agreement [2] the seller agrees to repurchase any account on which Thorp has not received full payment from the account debtor. The repurchase price is the amount of the net purchase price which has been paid to the assignor-creditor by Thorp, less any amounts collected from the account debtor.

The account debtor is advised of the transaction by two letters. The first is from the account creditor advising that they have made arrangements with Thorp. The second is from Thorp advising that they have purchased the account.

---

[2] "7. That seller will at the request of purchaser repurchase any account on which purchaser has not received full payment from the account debtor at a repurchase price equal to the net purchase price paid therefor by purchaser less all amounts received thereon by purchaser from the account debtor. Payment of such repurchase price will be made (a) in cash to the extent the cash paid by purchaser to seller for such account exceeds the cash received by purchaser from the account debtor on such account, and (b) the balance of the repurchase price will be charged to seller's holdback account. At purchaser's option, the entire repurchase price may be charged against or deducted from seller's holdback account or any other payment then or thereafter due from purchaser to seller."

The letter from Thorp sets up a payment schedule which varies in the number of instalments and amounts depending on the size of the indebtedness. The instalments are interest free.

When the account debtor meets the suggested instalment payment the matter is closed.

If the account debtor cannot meet the instalments, Thorp may extend a loan to refinance the account. If this is done, Thorp pays the assignor-creditor any holdback on the account. If Thorp does not receive full payment from the account debtor, the assignor-creditor must repurchase the account as provided in the agreement.

Thus, insofar as Thorp's dealings with the assignor-creditor are concerned, its income is represented by the negotiated discount at the time the agreement is executed. No interest or other charge is made to assignor-creditor at the time 50 percent of the purchase price is advanced or at any other time.

The record reflects that approximately 95 percent of the discounts range from seven to 10 percent. At the time of the trial about 50 to 55 percent of the accounts were paid off by the account debtor without any loan being made to them; the conversion rate of accounts into loans was between 15 and 20 percent and approximately 25 percent of the accounts were repurchased by the selling creditor.

Thorp will not commence a legal action to collect any delinquent open book account receivable.

Sec. 218.04 (4) (b), Stats.,[3] does not prohibit the issuance of a collection agency license to Thorp. However,

---

[3] "(4) . . . .

"(b) No licensee shall conduct a collection agency business within any office, room or place of business in which any other business is solicited or engaged in, or in association or conjunction therewith, except as may be authorized in writing by the department upon its finding that the character of such other business

the state banking department has a dual business agreement policy which prevents anyone from engaging in the loan business and the collection business in the same office.

Therefore, the nature of Thorp's loans to the account debtors becomes significant. The testimony of Mr. John F. Doyle, supervisor of consumer credit for the state banking department, reflects that the purpose of the dual business agreement rule is to prevent a collection agency, which is also operating as a small loan company, from coercing debtors to take out loans to pay debts which the collection agency is trying to collect. The trial court found that there was no evidence in the record of any coercion or compulsion by Thorp over any debtor whose accounts were assigned to and purchased by Thorp. We agree with this finding.

Before proceeding with the plan, Thorp received informal permission to do so from Mr. Doyle. After trial, and prior to argument on appeal, the commission took an official position that the plan did not violate sec. 218.04, Stats., for the reason that Thorp acquires full ownership and control over the accounts purchased and the 50 percent payment of the cost thereof prevents the Thorp plan from being a subterfuge. The attorney general has appeared in behalf of the commissioner of banks supporting this position.

The plaintiff contends that Thorp's purchases of accounts receivable are merely "pretended" purchases or "pretended" assignments which amount to a subterfuge within the purview of sec. 218.04 (11), Stats.[4] This posi-

is such that the granting of such authority would not facilitate evasion of this section or the lawful orders issued thereunder."

[4] "(11) SUBTERFUGE. The provisions of this chapter shall apply to any licensee or other person who, by any device, subterfuge or pretense whatever, shall make a pretended purchase or a pretended assignment of accounts from any other person for the purpose of evading the provisions of this section."

tion is based essentially on the provisions of paragraph 7 of the agreement relating to repurchase.

Thorp takes the position that the purchase agreement, being absolute on its face and for valid consideration, makes it the owner of the accounts and, therefore, it is collecting its own accounts and not accounts for others. They suggest that the repurchase agreement is similar to the "with recourse" privilege contained in other financing arrangements such as financing of instalment sales, or accounts receivable financing, which do not constitute "pretended purchases." The trial court took this view and we believe correctly so.

The plaintiff and Thorp each called, as a witness, a professor of finance from different universities. Suffice it to say they each supported the position of their respective client.

The Thorp plan differs from a collection agency operation in the following significant respects:

1. There is a written assignment, absolute on its face, for valuable consideration.

2. The consideration is an interest free advance by Thorp of at least 50 percent of the net purchase price within fifteen days of the execution of the agreement regardless of whether any money is collected during this period. Collection agencies do not make such advances.

3. The seller-creditor gives the account debtor notice that Thorp has purchased his account. In the case of a collection agency, notice of the assignment is given by the agency.

4. Under the Thorp plan the assignment is irrevocable, which gives Thorp complete control over the accounts purchased. A collection agency official testified that under collection agency practices the assignor-creditor is the boss as to how collections should be effected, and generally the assigning creditor retains the right to revoke the assignment.

5. The cost to the assignor-creditor under the Thorp plan usually ranges between seven and 10 percent (14 to 20 percent simple interest) where all the accounts are collected. Collection agencies charge fees ranging from 30 to 50 percent for all accounts collected.

6. Thorp bears the cost of collections, if any, which collection agencies do not.

Under the Thorp plan, Thorp makes working capital available to the assignor-creditors by making an advance payment to the assignors within fifteen days of the execution of the assignment regardless of whether they have received any payment from the account debtor. As previously indicated, the financial standing of the assignor-creditor is a significant factor in Thorp's decision to purchase accounts.

Evidence was introduced at the trial which demonstrated that in three instances the terms of the agreement were either not being complied with or not understood by the assignor-creditors.

One instance involves a county institution which had unilaterally elected not to accept the 50 percent advance payment. The institution had no separate account and its finances were handled through the office of the county treasurer. The discount charged on this account was seven percent.

The second situation was related by a former Thorp employee. He testified that during his employment he participated in two purchases, one of about 24 accounts and another of about 10 accounts, where the assignor-creditors had poor credit and, therefore, less than 50 percent of the net purchase price was paid at the time of the execution of the agreement.

The third situation concerns a hospital. The record indicates the hospital understood that it could request a return of an account assigned or sold to Thorp, if the

debtor preferred to handle the account with the hospital. There is no evidence that such a return of an account was ever made.

This litigation has been pending several years. The record reflects that the commissioner of banks and the plaintiffs conducted a thorough investigation of the operation of the Thorp plan. The trial was lengthy and the record is voluminous. The case was well tried as to both parties. As indicated by the trial judge, the action is primarily equitable in nature. We agree with the trial court's determination that where an advance of less than 50 percent of the net purchase price is made, or the seller refuses to accept the advance payment of the purchase price, or the seller either retains the right to recapture assigned accounts at its option or otherwise control the assigned accounts in any material way, the selling agreement would become a pretended sale and would be subject to regulation under sec. 218.04, Stats.

The respondent raises two issues in its notice of review.

1. Where a finance company advances to the seller of the accounts less than 50 percent of the purchase price, is the assignment of the accounts a pretended sale and purchase without bona fide consideration?

The issue before the court is not a question of bona fide consideration to support a contract, but rather whether the Thorp plan as set forth in the agreement constitutes a pretended purchase or assignment of accounts so as to make it subject to the licensing provisions of the statute for collection agencies. We do not feel compelled to give an advisory opinion as to whether Thorp could give a lower advance than set forth in its present plan. Under the circumstances of this case, a 50 percent advance of the net purchase price is adequate consideration to support the purchase.

2. Where the seller refuses to accept any payment of the purchase price advanced, even though legally entitled thereto, is the assignment a pretended sale?

The purpose of the Thorp plan is to create a system of financing which is not subject to the collection agency licensing provisions of sec. 218.04, Stats. The agreement has the official sanction of the commissioner of banks and is a contract that binds both parties and its terms and conditions must be complied with by both parties. As with the previously discussed issue, the question of legal or bona fide consideration is not the sole or controlling issue.

Thorp's motions for review are denied.

Sec. 218.04 (11), Stats., does not proscribe conduct in detail. Rather the law requires that one be licensed to collect accounts of others and prohibits a subterfuge or pretended purchase for the purpose of evading the law. The result is to require an examination of the facts of each case to determine whether a particular type of transaction constitutes a subterfuge to evade the law.

The record shows nothing in the Thorp plan which is inimical to public policy. Thorp is rendering an efficient and economical service to its creditor customers. The cost to creditors is less than the usual collection agency procedure (seven to 20 percent, seven to 10 percent in 95 percent of the cases). The Thorp plan, no doubt, has created competition for the plaintiffs. There is no evidence of any coercion or compulsion by Thorp over any account debtor.

The purpose of sec. 218.04, Stats., is basically regulatory; it is not intended to prevent competition. The record is clear that Thorp is already subject to regulation by the state banking department under several other statutory sections. Thorp is licensed under sec. 138.07 (*collateral loan law*) ; sec. 138.09 (*discount loan law*) (formerly secs. 115.07 and 115.09) ; and sec. 218.01

(*sales finance companies*); and ch. 214 (*small loans*). All of these licenses fall within the jurisdiction of the state banking department.

We, therefore, conclude that by the purchasing of accounts in accordance with the terms and provisions of the "agreement for purchase of accounts receivable" here under consideration, Thorp is not acting as a collection agency as defined by sec. 218.04 (1) (f), Stats.; that it is not making pretended purchases by way of a subterfuge, as defined by sec. 218.04 (11); and that it is not required to obtain a license or licenses under sec. 218.04 (2).

*By the Court.*—Judgment affirmed.